## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **NADRA DUNBAR**, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-872 (TSC) |
| | ) | |
| **ANTHONY FOXX**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Nadra Dunbar, proceeding *pro se,* brings this employment discrimination

Complaint against the National Highway Traffic Safety Administration ("NHTSA"), a

component of the Department of Transportation ("DOT").  Dunbar alleges that NHTSA

retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e–16, and 42 U.S.C. Section 1981.  (Third Am. Compl. pp. 1, 24-31).  She asserts that this

alleged retaliatory conduct escalated to the point where she experienced a hostile work

environment and was ultimately terminated in violation of these same anti-discrimination laws.

(*Id.* pp. 28-31).[1]  Dunbar also alleges that NHTSA's conduct violated the Civil Service Reform

---

[1]   Although Dunbar's Third Amended Complaint brings claims for retaliation, hostile work
environment, and "disparate treatment," (Third Am. Compl. ¶ 1), she does not assert any facts to
support a stand-alone disparate treatment claim.  Indeed, on appeal before the EEOC, Dunbar
alleged that "[n]one of [her] other similarly situated HR coworkers have had to endure the level of
scrutiny, over-the-top surveillance, harassing/hostile work environment," to which she was
subject, and that she was punished "only because [she] dare[s] to go against Mrs. Peoples by
testifying and providing sworn testimony . . . for Mrs. Robinsons [sic] EEO case against Mrs.
Peoples."  (Third Am. Compl. at ECF p. 65; *see also* Third Am. Compl. ¶ 83 ("Similarly situated
employee[s] (no know[n] prior EEO activity) were not subjected to same, similar or any adverse
treatment.")).  Such language indicates that Dunbar is comparing her treatment to persons who did

Act ("CSRA"), 5 U.S.C. § 1101 *et seq.*, and the Whistleblower Protection Act ("WPA"), 5

U.S.C. § 2302.  (Third Am. Compl. pp. 19-22, 31).

      NHTSA has moved to dismiss the Complaint or, in the alternative, for summary

judgment.  For the reasons set forth below, the court will GRANT the motion to dismiss

Dunbar's claims under Section 1981, the WPA, and all of her pre-termination retaliation claims,

except for those associated with her (1) August 2011 "Achieved Results/Meets Expectations"

performance evaluation, (2) August 2011 "dilution" of duties allegation, and (3) April 2012

transfer and relocation allegation.

## I.    BACKGROUND

      Dunbar joined NHTSA in 2005 as a Human Resources Specialist and Training Officer,

whose job responsibilities included drafting and implementing training programs, managing the

annual training budget, and working with NHTSA's Training Council.  (ECF No. 12, Defs. Ex.

A, Peoples Decl. ¶¶ 4, 7).[2]  These duties also included hiring outside vendors to perform agency

---

not participate in protected activity, rather than alleging that she was treated differently because of her membership in a protected class.  Accordingly, to the extent Dunbar asserts a disparate treatment claim, the court will dismiss this claim.

[2]   NHTSA previously submitted a motion to dismiss/motion for summary judgment which the court granted in part and denied in part, without prejudice.  (*See* ECF Nos. 12, 42; April 23, 2015 Minute Order).  The exhibits attached to that motion are designated with letters and some of those exhibits are pertinent to the currently pending motion.  (*See* ECF No. 12).  Accordingly, the court will cite to those exhibits using the appropriate letter designation.

    In contrast, the exhibits NHTSA attached to the instant motion are not separated by pages identifying the exhibits.  (*See* ECF No. 42).  Accordingly, the court will cite to the latter exhibits using ECF numbers found on the court's electronic docketing system, for example (ECF No. 42-2, Peoples Supp. Decl. ¶¶ 5-13).

    Likewise, Plaintiffs' designation of exhibits is difficult to follow.  Therefore, the court will cite to her documents using a description of her document and the appropriate ECF page number, for example (Pls. Response at ECF p. 114).

training sessions, for which Dunbar was issued a government purchase card.  (*Id.* ¶ 7).

In 2007, two years after she was hired, Darlene Peoples, Director of NHTSA's Office of Human Resources and Dunbar's direct supervisor, promoted Dunbar to a GS-14 and transferred her to a "team leader" position.  (Peoples Decl. ¶ 6).  Peoples alleges that the promotion included duties such as serving as Acting Director when Peoples was unavailable (Peoples Decl. ¶ 6), but Dunbar claims—without evidentiary support—that the promotion involved naming her Deputy Director.  (Third Am. Compl. ¶ 16).

Dunbar alleges that several years later, in May 2010, when she expressed an interest in obtaining a PhD through an agency-wide program designed to assist employees with their educational pursuits, Peoples supported her applications for the programs by rating Dunbar's performance at "5 out of 5" during the application process.  (Pls. Response at ECF p. 6 ¶ 5).

However, four months later, in September 2010, Peoples reclassified Dunbar from "Lead Human Resources Specialist" to "Human Resources Specialist (HRD)."  (Defs. Ex. B).  As a result of the reclassification, Dunbar was no longer a team leader, although it is undisputed that she maintained the same pay grade.  (Peoples Decl. ¶ 13; *see* Defs. Ex. B).  Peoples explained in her declaration that she had become concerned with Dunbar's unsatisfactory work performance because Dunbar purportedly: 1) was not attending meetings on behalf of Peoples; 2) was unable to deal with staff issues; and 3) disagreed with Peoples on how to handle various office matters. (Peoples Decl. ¶ 13).

According to Dunbar, her performance had not declined and she had not been the subject of any disciplinary action or performance counseling.  (Pls. Response at ECF p. 6 ¶ 6).  Dunbar claims that she learned of the reclassification when she received an automated personnel action notification email.  (*Id.*)  When questioned about the change, Peoples allegedly told Dunbar the

change was for "administrative purposes" and that she should "keep things as they are." (*Id.*) Dunbar asserts that the change coincided with the end of the probationary period for two new supervisors, and therefore Peoples no longer needed Dunbar's assistance with certain duties, including managing the two new supervisors. (*Id.*)

Around this same time in 2010, Dunbar failed to obtain approval for her 2011 Fiscal Year ("FY") budget and training plan by the due date. (Peoples Decl., ¶ 14). According to Peoples, the approval process for the training plan involves first submitting a draft to her and Greg Walter (Senior Associate Administrator and Dunbar's upper-level supervisor) for approval, then sending it to NHTSA's Training Council for additional comments and, finally, sending it to senior agency administrators. (*Id.* ¶¶ 8-9). Peoples claims that she and Walter expect the plan to be drafted, vetted and finally approved before October 1, which is the beginning of the fiscal year. (*Id.* ¶ 9).

Peoples alleges that at the end of October 2010, when Peoples and Dunbar met to discuss her performance review, Peoples expressed displeasure that Dunbar's FY2011 training plan had not been finalized, and told Dunbar her work needed to improve or she should not expect to receive an overall rating of "Exceeded Expectations" going forward. (Peoples Decl. ¶ 17). Dunbar contends that Peoples never pointed out any work deficiencies and that Peoples could not articulate why she failed to rate Dunbar as "Outstanding/Achieved Excellence," as she had in the past. (Pls. Response at ECF p. 6 ¶ 7).

Dunbar explains that the training plan was late because she was prohibited from releasing it until "congressional authorization" for funding came through. (Pls. Response at ECF pp. 3-4 ¶ 2; *id.* pp. 7-8 ¶¶ 10, 11). She claims that because of the funding issue, in past years NHTSA had not strictly enforced the due date, and that it was the department's practice to allow a flexible due

4

date given the budgetary issues.  (*Id.*)  Finally, Dunbar alleges Peoples and Walter were advised

of the plan's status and understood the reason for the delay.  (*Id.* pp. 3-4 ¶ 2; *id.* pp. 7-8 ¶¶ 10,

11).[3]  In a November 9, 2010 email to Peoples (copied to Walter), Dunbar indicates she was

awaiting feedback from Peoples before finalizing the plan.  (Defs. Ex. C).  But, Walter

responded to Peoples that the plan was late and asked her to "try to get the [training plan] to the

council by tomorrow—it is already a month late."  (*Id.*)

Despite the untimeliness of the training plan and the alleged performance issues that led

to Dunbar's reclassification, Dunbar asserts that shortly after the Walter email indicating her

training plan was late, she received a "significant performance bonus award for continuous

delivery of exemplary work."  (Pls. Response at ECF p. 6 ¶ 7; Third Am. Compl. ¶ 31).

Approximately three months later, on February 15, 2011, Peoples "switched duties"

between Ivonne Rodriguez and Tamika Robinson.  (Third Am. Compl. ¶ 19; *see* Pls. Response at

ECF p. 7 ¶ 8).  Dunbar alleges that she and Robinson "opposed" the Rodriguez/Robinson

personnel action, although Dunbar does not indicate if and how she expressed this opposition.

(Third Am. Compl. ¶¶ 19-21, 24).  Moreover, to the extent Dunbar did express her concerns to

Peoples, the Complaint does not indicate whether Dunbar actually articulated concerns about

alleged violation of CSRA personnel policies or concerns about alleged violation of Title VII.

(*See* Third Am. Compl. ¶ 24) (noting Rodriguez was promoted "seemingly without merit – such

---

[3]   Dunbar cites to Exhibit F as support for her position, but that exhibit does not contain any
documents discussing training plans.  (*See* Pls. Response at ECF pp. 112-120).

as without Merit System Principles[4] competition . . . or through an accretion of duties/desk

audit"). Dunbar also implies in her brief that her "opposition" involved complaining about

alleged Title VII violations. (*See* Pls. Response at ECF p. 8 ¶ 15). However, as the court will

address later, in three documents Dunbar prepared prior to filing her brief in this case, she

indicates that she opposed alleged Title VII violations associated with the Rodriguez/Robinson

personnel action several months after it occurred.

In her brief, Dunbar alleges that after she "opposed" the decision to Rodriguez/Robinson

personnel change, Peoples and Anna Williams (an HR Employee Relations Specialist) "began to

engage in 'tag-team' retaliatory behaviors against Plaintiff . . . and discriminatory practices . . .

by extreme fault-finding, excessive nit-picking, over-the-top surveillance and monitoring . . .

disrespect . . . comments . . . [b]elittling . . . [and] unwarranted scrutiny." (Pls. Response at ECF

p. 7 ¶ 9; *see id.* p. 8 ¶ 15).

During the same month that the Rodriguez/Robinson personnel change occurred,

NHTSA's Training Council provided its feedback on Dunbar's proposed FY2011 training plan,

and noted that the plan contained "mathematical-calculation issues." (Defs. Ex. D p. 2). The

following month, Dunbar and Peoples met for Dunbar's mid-year assessment, during which,

according to Peoples, the two discussed the untimely submission of the FY2011 training plan.

(Peoples Decl. ¶ 18).

Approximately one week later, on March 17, 2011, Peoples and Dunbar received the

---

[4]    "Merit System Principles" (Third Am. Compl. ¶ 24), or "merit systems protections" are
terms of art used in the context of cases involving alleged violations under the CSRA. *See
Wagner v. FEC*, 793 F.3d 1, 19, 31 (D.C. Cir. 2015). Reprisal for complaining about such
violations is a "prohibited personnel practice" that is actionable under the CSRA. *Dunning v.
Nat'l Aeronautics & Space Admin.*, 718 F.2d 1170, 1174 (D.C. Cir. 1983).

following email from Senior Procurement Analyst Pete Shultz:

> Nadra and Darlene: I see that the purchase card you use for acquiring training has been suspended due to delinquent payment approval.  I am currently at the DOT purchase card conference . . . and was embarrassed that NHTSA was identified as having the second highest percentage of suspended accounts within the Department of Transportation.  You may recall when David Strickland took over NHTSA, he sent a message to all offices expressing his concern over our high suspension rate. I'm concerned that if he should ask for the current status, I may have to take more drastic action then just a warning . . . .  You must have all your charges receive final approval from Darlene by no later than tomorrow.

(Defs. Ex. E, Bates #2105).

Shortly after receiving this email, Peoples responded with an email indicating that she had "gone in"—presumably to NHTSA's database—but did not see anything awaiting her approval and that Dunbar was out of the office.  (*Id.* at Bates #2109).  Schultz emailed back, noting that Dunbar had numerous unapproved charges, going back as far as December 2010, and that she needed to have the charges approved and forwarded to Peoples for final approval before they would show in Peoples' "queue." (*Id.*)  Schultz also stated that since the charges were not approved in a timely fashion, Dunbar's account would "remain suspended for another week." (*Id.*)

Five days later, Shultz followed up with an email to Dunbar and Peoples reminding them there were still twelve unapproved transactions on Dunbar's account that needed to be approved as soon as possible and that a "history of suspended accounts will result in the permanent cancellation of the purchase rights card for that individual." (*Id.*)

According to Peoples, training officers—such as Dunbar—are responsible for preliminarily approving pending transactions in a timely manner and then forwarding the transactions to Peoples for final approval.  (Peoples Decl. ¶¶ 10, 19).  Suspension of Dunbar's card: (1) prevented her from fulfilling one of her primary duties as training officer, which is

hiring vendors to perform trainings for the Agency; and (2) prevented payment of vendors in a timely manner.  (*Id.* ¶ 19)

Dunbar contends that she and Peoples were jointly responsible for managing the government purchase card, and implies that Peoples "regularly delayed" approval of the transactions.  (Pls. Response at ECF p. 4 ¶ 3).   The court notes that the email evidence does not appear to support Dunbar's explanation about the approval process.

Around April 9, 2011, Peoples and Dunbar had a run-in, after which Dunbar contends that Peoples accused Dunbar of having been irate, angry, disrespectful, and loud.  (Defs. Ex. N, Dunbar 2/6/12 Aff., Bates #422).  Approximately one week later, on April 18, 2011, an EEO counselor contacted Dunbar about acting as a witness for Robinson, who had filed an EEO complaint against Peoples.  (Pls. Response at ECF p. 8 ¶ 14; Third Am. Compl. ¶ 25).  Dunbar agreed and informed Peoples.  (Pls. Response at ECF p. 114).

As discussed above, Dunbar alleged in her <u>brief</u> that Peoples and Williams began retaliating against her <u>in February</u> after Dunbar "opposed" the Rodriguez/Robinson personnel changes.  (Pls. Response at ECF p. 7 ¶ 9; *see id.* p. 8 ¶ 15).  Dunbar also implies in her brief that her "opposition" involved complaints over alleged Title VII violations.  (*See* Pls. Response at ECF p. 8 ¶ 15).

But Dunbar paints a very different picture in three documents she prepared <u>before</u> her brief.  In her Third Amended Complaint, Dunbar claimed that in <u>April</u>, after she agreed to support Robinson's EEO claim, Peoples and Williams "began to unfairly scrutinize Plaintiff's performance and subject[] her to retaliatory behaviors and discriminatory practices."  (Third Am. Compl. ¶ 26; *see id.* ¶ 41).  More importantly, in a <u>sworn EEO statement</u>, prepared while Dunbar <u>was represented by counsel</u> (prior to her termination), she complains about a series of

8

allegedly retaliatory incidents that began after "participating in prior EEO activity pertaining to Ms. Robinson's EEO complaint against Ms. Peoples."  (Defs. Ex. M, Bates #167, 166).  Similarly, in a letter summarizing Dunbar's EEO Charge, NHTSA indicates Dunbar alleged that she was retaliated against "since approximately April 2011."  (Defs. Ex. F, Bates #133).

Dunbar alleges that, in early August 2011, and supposedly "in reprisal" for Dunbar's support of Robinson, Peoples gave Dunbar an unfair performance appraisal for the October 1, 2010 through May 21, 2011 rating period.  (Third Am. Compl. ¶¶ 28, 33).[5]  Peoples claims that she lowered Dunbar's overall rating to "Meets Expectations" because of the untimely and inaccurate FY2011 training plan, as well as Dunbar's "mismanagement" of the government purchase card.  (Peoples Decl. ¶ 20; see Third Am. Compl. ¶ 29; Pls. Response at ECF pp. 33-37; Pls. Response at ECF p. 9 ¶ 16).

Dunbar notes that "Meets Expectations"[6] or "Achieved Results" was the lowest rating she received while working for NHTSA and contends that, until then, she had not received any performance counseling from Peoples, nor had she been advised that her performance was suffering.  (Third Am. Compl. ¶¶ 29-30, 32).  Moreover, Dunbar contends Peoples had indicated in the past that Dunbar should "'keep things as they are' reflecting continuation of excellent work."  (Id. ¶ 30).

Despite her concerns about the training plan and the government purchase card, Peoples

---

[5]    Dunbar indicates the review was for the period June 2010 through May 31, 2011, (Pls. Response at ECF p. 9 ¶ 16), but her performance review document indicates that it covered the period indicated by Peoples.  (Pls. Response at ECF pp. 33-37).

[6]    Although Peoples refers to the overall rating as "Meets Expectations," (Peoples Dec. ¶ 20), the performance evaluation form uses the phrase "Achieved Results."  (Pls. Response at ECF p. 33).

did not give Dunbar any negative ratings in the five sub-categories listed on the performance evaluation form.  Dunbar received an "Exceeds Results" rating in the category described as "Risk-taking, Initiative, and Innovation," as well as in the category described as "Customer Service," which may include delivering "high quality products/services to internal/external customers" and "[h]onors commitments and agreed upon deadlines."  (Pls. Response at ECF pp. 36-37).  Dunbar received a "Meets Expectations" rating in the remaining three categories, including "Teamwork," "Technical Competency," and "Individual Work," the latter of which "may" include "[c]ompletes work within established deadlines" and "[f]ollows management procedures, directives, regulations, or technical orders."  (*Id.* at ECF pp. 34-36).  This evaluation appears inconsistent with the concerns Peoples now claims she had about Dunbar's performance.

Several weeks later, around August 23, 2011, Dunbar met with Peoples and learned that she intended to "dilute" Dunbar's job responsibilities by dividing  them between Dunbar and Robinson, a junior HR staffer whom Dunbar had trained.  (Third Am. Compl. ¶¶ 35-38).  Dunbar appears to allege that, after the performance review and "dilution" of duties, she did not receive a bonus, while her co-workers did.  (Third Am. Compl. ¶ 42; ECF No. 52, Pls. Supp. Response at ECF p. 7).  Dunbar also claims that her performance review ratings negatively impacted her training and promotion opportunities.  (*Id.*)

Dunbar alleges that after the meeting, Peoples and Williams conspired to "trump-up" performance issues by trying to enlist Robinson as a witness to Dunbar's alleged negative temperament during the meeting.  (Third Am. Compl. ¶¶ 39-40).  Dunbar contends that Peoples and Williams explained to Robinson that they needed her assistance and allegedly dangled a promotion as a reward for her cooperation, but Robinson declined to corroborate their version of

the events surrounding the meeting.  (*Id.* ¶ 40).

Several months later, in November 2011, Dunbar filed her first EEO charge, alleging

retaliation.  (*See* Defs. Ex. F; Third Am. Compl. ¶ 43).  She claims that shortly after she filed the

charge, NHTSA employees began to "circle the wagon" even more, or "ratchet-up" the alleged

retaliation.  (Third Am. Compl. ¶ 44).  Among other things, she claims that NHTSA began to

"alter, manipulate, revise[] and back date, etc. emails and documents, including litigation holds in

order to bias evidence and pertinent information needed in an employee defense against the

Agency," and that NHTSA extracted, deleted, and spliced her documents and emails "in order to

neutralize and nullify Plaintiff's EEO complaints."  (Pls. Response at ECF pp. 16, 10 ¶ 24).

Peoples alleges that, like the FY2011 training plan, Dunbar's FY2012 training plan was

also late.  (Peoples Decl. ¶ 21; *See* Pls. Response at ECF p. 106).  On January 13, 2012, Dunbar

emailed Peoples and Walter, updating them on the draft FY2012 plan.  (Defs. Ex. G).  As he had

done the prior year, Walter responded with consternation, this time complaining that Dunbar's

draft was "significantly late" and inquiring why she was still proposing another round of

approvals by the Training Council.  (*Id.*)  Further, he "insist[ed]" that Dunbar make certain

updates within a specified timeframe.  (*Id.*)  When Dunbar submitted a draft on January 31,

Peoples complained the plan was "unusable and contained a number of inaccurate statements and

budget amounts."  (*See* Pls. Response at ECF p. 106).

In addition to the issues regarding the training plan, Peoples subsequently became aware

of complaints by the Training Council about Dunbar.  (Peoples Decl. ¶ 21).  The Training

Council met approximately ten days after Walter's email about the late training plan, and their

meeting minutes reflect their concerns that: (1) the training plans were not finalized in a timely

manner; (2) for years Dunbar had failed to incorporated the Council's revisions and, in the most

11

recent year, she had returned a draft to the Council that "had no text, only tables and a cover

sheet"; and (3) Council Chairs over several years had experienced "conflict" with Dunbar. (Defs.

Ex. H).  As a result of these problems, the Council agreed that the "training management

problems need[ed] to be addressed" and the "broken process" fixed, and it was decided that the

Chair would speak with Walter about its concerns.  (*Id.*)

The following month, on March 7, 2012, Dunbar contacted the Office of the Inspector

General's ("OIG") complaint center "for assistance and protection regarding what the Plaintiff

described as 'deleterious and fraudulent management practices'" or "wrongdoings."  (Pls.

Response at ECF pp. 9-10 ¶ 18; *id.* at ECF p 10 ¶ 21).  She advised the OIG that she believed

NHTSA was trying to terminate her and claims she engaged in "whistleblowing activities."  (*Id.*

at ECF pp. 9-10 ¶¶ 18, 21).  These "whistleblowing activities" appear to involve what Dunbar

describes as "Privacy Act" and "Cyber security violations involving her office computer," and

apparently relate to her claims that NHTSA tampered with emails and documents on her work

computer.  (Third Am. Compl. ¶¶ 60-63; Pls. Response at ECF p. 10 ¶ 24; *id.* at ECF p. 16).

A month later,  Peoples transferred Dunbar from her position as a Human Resources

Specialist (HRD) to a position as a Human Resources Specialist (Strategic Human Capital).[7]

(Defs. Ex. I; Third Am. Compl. ¶¶ 52-53; Peoples Decl. ¶ 22; *see* Pls. Response at ECF pp. 106-

08).  This transfer stripped Dunbar of her training officer duties, but her pay remained unchanged.

(Defs. Ex. I, Peoples Decl. ¶ 22; Pls. Response at ECF pp. 106-08).  In a letter memorializing the

matter, Peoples explained that the transfer was because of Dunbar's ineffective handling of the

---

[7]    Although Dunbar indicates at various points in her Complaint that this transfer occurred in
2011 (Third Am. Compl. ¶¶ 53, 56-57), Dunbar's personnel form indicates the transfer to the
Human Resources (Strategic Human Capital) position occurred in 2012.  (Defs. Ex. I; *see* Peoples
Decl. ¶ 22; Third Am. Compl. ¶¶ 52-53).

training program and complaints about Dunbar that had increased over the prior two years.  (*Id.* at ECF p. 106).  Peoples noted that two different NHTSA Training Councils had complained that Dunbar did not work collaboratively with them and failed to effectively manage the training program, but when Peoples tried to correct the problems Dunbar had resisted her instructions. (*Id.*)  Peoples pointed out that Dunbar had consistently failed to complete the training plan before the fiscal year ended and there were numerous problems with the plans.  (*Id.*)

In the letter, Peoples also accused Dunbar of creating controversy by attempting to change the eligibility criteria for an Agency program, in an effort to benefit an individual employee, as well as telling the employee's supervisor to submit the employee's application—even though the employee did not meet the program requirements.  (*Id.* at ECF p. 107).  Later, despite a warning from Peoples, Dunbar included the applicant's name on the list of qualified candidates.  (*Id.*) Peoples also complained that when she tried to speak with Dunbar about her concerns, Dunbar became argumentative, confrontational, yelled at Peoples on at least three occasions, and inundated Peoples with emails containing inaccurate, confrontational, and disrespectful statements.  (*Id.*)  Dunbar also allegedly sent similar emails to persons outside HR when they brought their concerns about training matters to her attention.  (*Id.*)

Dunbar disputes these allegations, contending that the transfer was in retaliation for her EEO activities and disclosure of unspecified agency "wrongdoing."  (*See* Pls. Response at ECF p. 10 ¶ 19).  Dunbar also appears to allege that the transfer resulted in her working on a failed project, for which Peoples refused to provide Dunbar with adequate resources, thereby hindering her performance.  (Third Am. Compl. ¶¶ 56-57).

Because of the transfer, Dunbar moved from an office into a cubicle, where she was isolated from the HR staff.  (Third Am. Compl. ¶ 54; Peoples Decl. ¶ 23).  Peoples claims Dunbar

was moved because her new position no longer required that she have confidential conversations, and the office she had previously occupied was needed by an employee who routinely handled personnel matters.  (*Id.*)  Dunbar filed another EEO complaint the day she received the transfer.  (*See* Third Am. Compl. ¶¶ 52-53).

Four months later, in August 2012, Dunbar received her performance evaluation for the June 1, 2011 through May 31, 2012 period.  (Pls. Response at ECF pp. 39-46).  Peoples gave Dunbar another "Achieved Results," overall rating, but this time noted "[t]he following areas of concern were discussed through the rating period as well as mentioned in the reassignment memo dated 4/6/12": (1) "[o]n-going communication problems between" Peoples and Dunbar; (2) "FY Training plan"; (3) "disruptive e-mails of protest to changes in the [o]ffice"; (4) "[h]andling of the DRAP program and the Academic Degree Program";[8] and (5) "[c]ollaborative problems with [the] Training Council."  (*Id.*)

Approximately one year later, Dunbar filed this lawsuit.  Several months after that, Peoples evaluated Dunbar regarding a previously discussed Performance Plan and again rated Dunbar as "Achieved Results."  (Pls. Response at ECF pp. 56-63).  This evaluation included categories such as:

- "Individual Work," which includes "[w]ork products are clear and well organized," and "completes work within established deadlines."  (Pls. Response at ECF p. 57).

- "Technical Competency," which includes "[d]emonstrates quality and accountability in the majority of work activities."  (*Id.* at ECF p. 58).

- "Teamwork," which includes "[w]orks well with others in developing and implementing solutions to problems" and "[m]aintains effective working relationship with team members."  (*Id.* at ECF p. 59).

---

[8]   This performance issue appears to relate to the incident in which Dunbar is alleged to have wrongly advised an employee that she could bypass certain criteria and participate in an Agency program.  (*See* Third Am. Compl. ¶ 46; Pls. Response at ECF p. 107).

14

- "Innovation," which includes "[t]akes into consideration new ideas and differing professional opinions," and "[d]emonstrates integrity and professionalism." (*Id.* at ECF p. 60).

- "Customer Service," which includes "[p]rojects positive attitude," and "[t]reats everyone with courtesy and respect." (*Id.* at ECF p. 61).

Despite ample space for comments, Peoples did not include any comments or criticisms, as she had on the previous evaluation. (*Id.* at ECF pp. 56-63). This neutral evaluation implies that, either Dunbar's performance had improved, or Peoples failed to document her concerns.

In May 2014, Dunbar advised management that she had discovered all of her office computer documents and emails were being sent to one of the attorneys who represents NHTSA in this litigation, as well as to other unknown entities both inside and outside the agency. (Third Am. Compl. ¶¶ 59-61).

The day after Dunbar reported that her emails were being forwarded, Peoples authored a Proposed Removal document, in which she recommended terminating Dunbar for various reasons, including:

(1)   insubordination due to Dunbar's failure to make certain corrections on workforce plans, despite explicit orders from Peoples;

(2)   making false statements relating to Dunbar's time and attendance records;

(3)   intentional misrepresentation relating to Dunbar's alleged plagiarism of almost an entire workforce planning document; and

(4)   workplace disruptions, including Dunbar's apparent inappropriate involvement of upper level managers in HR matters, as well as Dunbar's allegedly inappropriate emails to co-workers, even after Peoples had instructed Dunbar to refrain from sending the emails.

(ECF No. 42-2, Peoples Supp. Decl. ¶¶ 5-13).

On or around July 14 or 18, 2014, NHTSA terminated Dunbar. The following month, she filed a "mixed complaint" with the Merit Systems Protection Board ("MSPB") challenging her

termination.[9]  (Third Am. Compl. ¶ 70).  The MSPB has not issued a final decision in Dunbar's case.

## II.    LEGAL STANDARD

When a party moves to dismiss under Rule 12 for failure to state a claim upon which relief may be granted and presents matters outside the pleading and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  *Colbert v. Potter*, 471 F.3d 158, 167 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks omitted).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[10]

To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)

---

[9]  "When an employee challenges an adverse personnel action that is subject to appeal to the MSPB and that is coupled with a discrimination claim—a 'mixed case'—[s]he must navigate a procedural regime of Title VII regulations <u>and</u> Civil Service Reform Act regulations."  *Taylor v. Mabus*, 685 F. Supp. 2d 94, 97 (D.D.C. 2010) (citing 5 U.S.C. § 7702) (emphasis in original).

[10]  Dunbar attached over 60 pages of exhibits to her Third Amended Complaint (ECF No. 39) and almost 150 pages of exhibits to her opposition brief (ECF No. 44).  Additionally, the court allowed Dunbar to file a supplemental opposition brief, to which she attached 6 pages of exhibits.  (*See* ECF No. 52).

Because both parties relied extensively on documents "outside of the pleadings," the court will evaluate NHTSA's motion under the summary judgment standard.  *See* Fed. R. Civ. P. 12(d); Fed. R. Civ. P. 56; *Colbert*, 471 F.3d at 167-68 (upholding district court's failure to issue prior notice that it was converting a motion to dismiss to a motion for summary judgment where: (1) the defendant moved for summary judgment in the alternative; (2) the defendant attached extra-pleading material to the motion; and (3) the plaintiff responded with exhibits); *Smith v. Lynch*, 106 F. Supp. 3d 20, 36-37 n.20 (D.D.C. 2015) (citations omitted).

(internal quotation marks omitted).  A dispute is "genuine" only if a reasonable fact-finder could

find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome

of the litigation.  *Id.*; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In

assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most

favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d

57, 65 (D.D.C. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

Finally, the court is mindful that *pro se* pleadings must be liberally construed, as they are

held to "less stringent standards than formal pleadings drafted by trained lawyers."  *Budik v.

Dartmouth–Hitchcock Med. Ctr.,* 937 F. Supp. 2d 5, 11 (D.D.C. 2013) (quoting *Erickson v.

Pardus,* 551 U.S. 89, 94 (2007)) (internal quotation marks omitted).  This liberal standard, on the

other hand, "is not . . . a license to ignore the Federal Rules of Civil Procedure."  *Neuman v.

United States*, 70 F. Supp. 3d 416, 422 (D.D.C. 2014) (internal citations and quotation marks

omitted).  "Accordingly, in the context of Rule 56, a '*pro se* plaintiff must meet his burden of

proving that there exists a genuine dispute as to a material fact to survive a motion for summary

judgment.'"  *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (citation omitted).

## III.   ANALYSIS

### A.  Section 1981 Claims

The court finds that Dunbar's Section 1981 claims are not actionable because Title VII

"provides the exclusive judicial remedy for claims of discrimination in covered federal

employment."  *Richardson v. Wiley,* 569 F.2d 140, 141 (D.C. Cir. 977) (per curiam).  Thus,

 "covered federal employees may not sue alleging discrimination under other federal statutes,

including § 1981."  *Gong v. Napolitano*, 612 F. Supp. 2d 58, 60 n.1 (D.D.C. 2009) (internal

17

quotation marks omitted) (citing *Richardson*, 569 F.2d at 141).  Accordingly, the court will dismiss Dunbar's Section 1981 claim.[11]

### B.  Title VII Retaliation

Dunbar challenges a wide range of allegedly retaliatory conduct, including excessive "nit-picking," unwarranted scrutiny, assignment to failed projects, lack of supervisory support, reassignment of duties, IT tampering, lowered performance evaluations, at least one missed bonus and termination.  To establish a prima facie case for retaliation in violation of Title VII, 42 U.S.C. § 2000e–3(a), a plaintiff must present evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took a "materially adverse" employment action against her; and (3) the adverse action was causally related to the exercise of her rights.  *Porter v. Shah*, 606 F.3d 809, 817-18 (D.C. Cir. 2010) (citations omitted); *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006) (citations omitted).

### 1.  Protected Activity

Title VII prohibits retaliation directed at anyone who engages in protected activity by opposing, among other things, discrimination based on race, gender, or national origin.  Opposition need not take the form of a formal EEOC filing, but may instead include providing a statement about alleged discrimination during an EEO investigation.  *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 273 (2009); *see also Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  Although the opposition need not specifically reference Title VII, it must "in some way allege unlawful discrimination" and not merely complain of management decisions with which plaintiff disagrees.  *Broderick*, 437 F.3d

---

[11]   Although Dunbar's Complaint contains three counts, she brings other claims that she did not identify in independent "counts."  Accordingly, the court will dismiss claims, rather than counts.

at 1232; *see also Gibbs v. Wash. Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 132 (D.D.C. 2014).

As an initial matter, the court must identify the point at which Dunbar first engaged in protected activity.  Although Dunbar implies in her brief that she engaged in Title VII protected activity in February 2011 (*see* Pls. Response at ECF p. 8 ¶ 15), there is no evidence that Dunbar communicated to Peoples or other managers any concerns about alleged Title VII protected discrimination surrounding the Rodriguez/Robinson personnel changes at the time they occurred. Indeed, three documents prepared prior to the date she filed her brief make this clear: (1) Dunbar's Third Amended Complaint, in which she alleges she "opposed" personnel actions which violated the CSRA, not Title VII; (2) Dunbar's own sworn EEO statement, in which she alleged retaliation began after she assisted Robinson with her EEO complaint in April 2011; and (3) the NHTSA's letter summarizing Dunbar's EEO charge, which states Dunbar alleged retaliation since April 2011.[12]   Thus, Dunbar's Complaint and EEO documents (which pre-date her current brief) indicate that the Title VII retaliation began around April 2011, and Dunbar has provided no evidence—save her unsupported claims in her opposition brief—to contradict that finding.

Courts have long held that a party may not create a material issue of fact simply by contradicting prior sworn testimony.  *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) (citing *Martin v. Merrell Dow Pharm., Inc.,* 851 F.2d 703, 706 (3d Cir.1988); *Kizas v. Webster,* 492 F. Supp. 1135, 1147 n. 42 (D.D.C. 1980), *rev'd on other*

---

[12]   The court notes that the NHTSA letter was an "amended" document issued after Dunbar requested changes to the original letter, in which the agency had initially identified July 2011 as the date that the retaliation began.  (*See* Defs. Ex. F, Bates #133-34, #131).

*grounds,* 707 F.2d 524 (D.C. Cir. 1983)) (some citations omitted).  "The objectives of summary

judgment would be seriously impaired if the district court were not free to disregard the later

testimony." *Pyramid Sec. Ltd.*, 924 F.2d at 1123 (citing *Martin,* 851 F.2d at 706) (alterations

omitted).  Therefore, "the prior sworn statement will receive controlling weight unless the

shifting party can offer persuasive reasons for believing the supposed correction." *Pyramid Sec.

Ltd.*, 924 F.2d at 1123 (citing *Farrell v. Auto. Club of Mich.*, 870 F.2d 1129, 1131-32 (6th

Cir.1989)).

Dunbar has not offered any reasons, "persuasive" or otherwise, which might explain the

apparent contradiction between her opposition brief and her earlier drafted Third Amended

Complaint, sworn statement and EEO charge summary letter.  Accordingly, the court finds that

Dunbar engaged in protected activity in April 2011, rather than February 2011.

## 2.  Causation

NHTSA does not dispute that Dunbar engaged in protected activity in April 2011 when

she provided assistance to Robinson, but argues that Dunbar cannot establish that her

involvement with Robinson's EEO charge was the cause of the alleged retaliation.

NHTSA first argues that any post-April 2011 retaliation could not have been caused by

Dunbar's assistance to Robinson because Dunbar claims her relationship with Peoples began to

deteriorate three months earlier, in February.  Indeed, as the court noted above, Dunbar alleges

that Peoples began some form of retaliation after Dunbar and Robinson "opposed" the

Rodriguez/Robinson personnel change in February 2011.

Still, the court is not persuaded by NHTSA's argument.  Dunbar complains of nit-

picking, extreme fault-finding, disrespect, and unwarranted scrutiny immediately following her

February 2011 "opposition" to the Rodriguez/Robinson personnel change.  (Pls. Response at

ECF p. 7 ¶ 9; *see id.* p. 8 ¶ 15).  However, Dunbar also alleges that the retaliation "ratcheted up"

after April 2011, when she assisted Robinson with her EEO charge, at which point Peoples

began to unfairly evaluate Dunbar's performance, reassign her duties to other employees, and

ultimately terminated her.  (*See* Third Am. Compl. ¶ 33).  Thus, a reasonable fact-finder might

determine that the February through April retaliation was motivated by Dunbar's opposition to

alleged violations of the CSRA, while the post-April 2011 retaliation was motivated by Dunbar's

Title VII protected activity.

Alternatively, a reasonable fact-finder might determine that the post-April retaliation was

motivated by <u>both</u> retaliatory animus over Dunbar's complaints about alleged CSRA violations

and her complaints about alleged Title VII violations.  If so, then Dunbar's retaliation claims

would fail because "[u]nlike in the discrimination context, there are no mixed-motive retaliation

claims; the plaintiff must establish that retaliation was the 'but-for' cause of the adverse action in

order to" move forward.  *Duncan v. Johnson*, No. 14-1642, 2016 WL 5719714, at *14 (D.D.C.

Sept. 30, 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

"'This requires proof that the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer.'"  *Duncan*, 2016 WL 5719714, at *14 (citing

*Univ. of Tex. Sw. Med. Ctr.*, 133 S. Ct. at 2533).  Given that a reasonable fact-finder might reach

different conclusions, and viewing the facts in the light most favorable to Dunbar, the court finds

that there is a factual dispute with regard to causation on this issue.

NHTSA's second causation argument is equally unavailing.  NHTSA contends that

Peoples began addressing Dunbar's performance issues long before she engaged in protected

activity, stripping Dunbar of her team leader duties and warning her about performance issues in

2010—the year before she engaged in protected activity.  NHTSA argues that these 2010 actions

closely resemble the personnel actions Peoples took later, such as lowering Dunbar's performance evaluation, and that given the similarity in Peoples' response to Dunbar in 2010 and Peoples' response post-April 2011, Dunbar cannot establish retaliatory motive. *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009) (rejecting plaintiff's non-selection retaliation claim where the agency had previously declined to hire plaintiff on three separate occasions prior to the date she engaged in protected activity).

NHTSA's argument is flawed because the facts here do not clearly establish that the agency engaged in the same—or even similar—activity both before and after Dunbar assisted Robinson with her EEO charge in April 2011.  There are disputed facts regarding what occurred in 2010 and why.  Peoples claims she relieved Dunbar of her "Team Leader" duties in 2010 for performance reasons and warned Dunbar that her performance needed to improve or she should not expect to receive an "Exceeded Expectations" rating on her next performance review. (Peoples Dec. ¶ 17).  Dunbar claims that the 2010 change coincided with decreased demand for supervising employees whose probation had ended.  (Pls. Response at ECF p. 6 ¶ 6).  She also claims to have received no warning about her performance around that time and there is nothing in the record documenting any performance issues then.  (*See id.*)  More importantly, Dunbar contends she received a "significant bonus" after the 2010 performance review, and it appears that she received the bonus around the same time concerns were raised about the late training plan.  (*Id.* at ECF p. 6 ¶ 7; Third Am. Compl. ¶ 31).  An "Exceeded Expectations" rating and a bonus are inconsistent with the concerns Peoples claims she had about Dunbar's performance in 2010.

Moreover, even after the training plan issues re-emerged in February/March 2011, along with concerns about Dunbar's purchase card, there was still no evidence of any disciplinary

22

action or warning.  However, in August 2011, just four months after Dunbar assisted Robinson

with her EEO complaint, Peoples gave Dunbar an "Achieved Results" rating.  While this was not

a negative evaluation, Dunbar alleges this was the lowest rating she had ever received and she

appears to allege that she did not receive a bonus as a result of the rating.  (Third Am. Compl. ¶

42; Pls. Supp. Response at ECF p. 7).  Sometime after Dunbar filed her own EEO complaint in

November 2011, Peoples stripped Dunbar of her training officer duties, as well as relocated her

away from the HR staff and ultimately terminated her in 2014.

This evidence indicates that there is a factual dispute as to whether Peoples responded to

Dunbar's alleged performance issues in a similar manner both before and after she engaged in

protected activity.  Accordingly, NHTSA's second causation argument also fails.[13]

### 3.  Materially Adverse Employment Actions

NHTSA argues that Dunbar cannot establish that the alleged pre-termination retaliatory

conduct constituted "materially adverse" employment actions.  "Petty slights or minor

annoyances" do not rise to the level of actionable adverse actions.  *Burlington N. & Santa Fe Ry.

Co. v. White*, 548 U.S. 53, 68 (2006).  Likewise, criticism for "negative behavior" is not a

materially adverse action.  *Taylor v. Solis,* 571 F.3d 1313, 1321 (D.C. Cir. 2009) (citing

*Burlington N.*, 548 U.S. at 68).

In order to meet the "materially adverse" standard, a plaintiff must suffer some

"objectively tangible harm."  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (citation

---

[13]    NHTSA argues that Dunbar is foreclosed from pursuing her "post-2013 retaliation claims" because she did not exhaust her administrative remedies with respect to these claims.  (Defs. Br. pp. 15-18).  The court declines to reach this argument because NHTSA failed to provide Dunbar's EEO charges.  NHTSA also failed to specify which post-2013 claims are allegedly foreclosed.

and internal quotations omitted).  The harm must be such "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (citations and internal quotations omitted).

The court finds that Dunbar has met the "objectively tangible harm" standard with respect to three of her discrete pre-termination retaliation allegations: (1) the August 2011 "Achieved Results/Meets Expectations" lowered performance evaluation that appears to have cost Dunbar a bonus; (2) the August 2011 "dilution" of Dunbar's duties; and (3) the April 2012 transfer that stripped her of her training officer duties and relocated her away from other HR employees. Dunbar's allegation that she did not receive a bonus as a result of her lowered performance evaluation (*see* Third Am. Compl. ¶ 42; Pls. Supp. Response at ECF p. 7), is sufficient to allege the required "objectively tangible harm."  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); *Douglas v. Donovan,* 559 F.3d 549, 553 (D.C. Cir. 2009) (citations omitted).[14] Likewise, Dunbar may be able to establish "objectively tangible harm" with respect to her allegations regarding the "dilution" of her duties and the transfer that relieved her of her training officer responsibilities.  As the D.C. Circuit has recognized, retaliatory adverse actions may

---

[14]   Dunbar also alleges that the lowered performance evaluation negatively impacted her training and promotion opportunities.  (*See* Pls. Supp. Response at ECF p. 7).  However, she has not provided any specific evidence to support this allegation or her allegation that she was denied a bonus.  Mindful of Dunbar's *pro se* status, the court reminds her that, during the next round of dispositive briefing on these issues, she will have to proffer more than "bare . . . conclusory allegation[s]" to support her allegation that she suffered materially adverse consequences from the lowered performance evaluation.  *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (finding lowered performance evaluation did not constitute a materially adverse employment action because plaintiff had not come forward with evidence that the evaluation was "attached to financial harms").

include "[w]ithdrawing an employee's supervisory duties" or a "reassignment with significantly different responsibilities." *Czekalski v. Peters,* 475 F.3d 360, 364 (D.C. Cir. 2007) (citations omitted); *see Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) ("Lateral transfers—those entailing no diminution in pay and benefits—qualify as adverse employment actions if they result in materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment.") (internal citations and quotation marks omitted). Finally, the April 2012 and relocation that isolated her from other HR personnel may also constitute "objectively tangible harm." *See Karmel v. City of New York*, 200 F. Supp. 2d 361, 367 (S.D.N.Y. 2002) (allowing retaliation claim to go forward where plaintiff alleged, *inter alia*, that she was isolated from her supervisors and co-workers and transferred to a position with significantly less challenging duties).

However, the court finds that Dunbar failed to establish that she suffered "objectively tangible harm" with respect to any remaining pre-termination retaliation claims. Therefore, to the extent Dunbar asserts retaliation claims with regard to any other discrete pre-termination incidents, the court will the grant NHTSA's motion for summary judgment.

### 4. Hostile Environment Claim

The D.C. Circuit has "recognized a special type of retaliation claim based on a 'hostile work environment.'" *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (citation omitted). Such a claim may arise when several individual acts of retaliation that "may not be actionable on their own . . . become actionable due to their cumulative effect." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002) (internal quotations and alternations omitted)). These "constituent acts must be adequately linked such that they form a coherent hostile environment claim. For example, they might involve the same type of employment actions,

occur relatively frequently, and be perpetrated by the same managers." *Baird*, 792 F.3d at 168-

69 (citations and alterations omitted).  Finally, the retaliatory

> acts must be of such severity or pervasiveness as to alter the conditions of
> employment and create an abusive working environment. Severity and
> pervasiveness are determined by reference to all the circumstances including the
> frequency of the discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance.

*Id.* at 169 (citation, alterations, and internal quotation marks omitted).

The court finds that summary judgment is not appropriate as to Dunbar's hostile work

environment retaliation claim.  The court disagrees with NHTSA's assertion that Dunbar's

complaints amount to no more than "the ordinary tribulations of the workplace."  (*See* Defs. Br.

p. 15).  She alleges constant interference with and unfair scrutiny of her work performance,

excessive ridicule, reassignment of her duties to other employees, "trumped-up" conduct issues,

lowered performance evaluations, along with at least one lost bonus, assignment to at least one

failing project, lack of adequate assistance or resources to meet the demands of the project,

imposition of "outlandish" work related requirements and changes, workforce bullying, a climate

of fear and intimidation, routine humiliation, computer tampering, relocation away from other

HR employees, and more.  (*See* Third Am. Compl. ¶¶ 6, 26, 35, 39, 56-57, 58-62, 87, 97; Pls.

Response at ECF p. 10 ¶ 24; Pls. Response at ECF p. 15-16; ECF No. 52, Pls. Supp. Resp. at

ECF p. 5, 7).  These allegations, if true, are sufficient to establish that Dunbar endured retaliation

sufficiently severe and pervasive to constitute a retaliatory hostile work environment.

### 5.  Termination Claim

### i.  Merit Systems Protection Board

NHTSA argues that Dunbar cannot pursue her Title VII termination claim because she is prosecuting that claim before the MSPB, but NHTSA provides no legal authority in support of its position.  Dunbar counters that she may proceed with her Title VII termination claim in this court because her appeal before the MSPB involved a "mixed case"—combined Title VII and CRSA claims—and the appeal remained unresolved for more than 120 days.  (*See* Pls. Response at ECF p. 18 ¶ 10; Third Am. Compl. ¶ 104).[15]  However, Dunbar's argument suffers from the same deficiency as NHTSA's; neither side has provided the court with appropriate legal authority in support of their positions.

Despite the lack of assistance from the parties, the court finds that Dunbar's position is correct.  As this Circuit has explained:

> When a complainant appeals to the MSPB, either directly or after pursuing her claim with the agency EEO office, the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law. *See* 5 C.F.R. §§ 1201.41(b), 1201.111. . . . [I]f the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court.  *See* 5 U.S.C. § 7702(e)(1)(B).

*Butler v. West*, 164 F.3d 634, 638-39 (D.C. Cir. 1999).  In other words, even though the MSPB does not lose jurisdiction after 120 days without a final decision, "the appropriate federal district

---

[15]  The contours of her CSRA claims before the MSBP are unclear.  In her case here, however, Dunbar appears to raise three CSRA-related claims: (1) a WPA whistleblower retaliation claim; (2) a claim alleging violation of prohibited personnel practices relating to favoring relatives; and (3) a claim alleging retaliation for exercising employee rights.  (*See* Third Am. Compl. ¶¶ 30, 111) (citing the WPA, 5 U.S.C. § 2302(b)(8)); 5 U.S.C. § 2302(b)(7) (prohibiting making certain personnel actions on behalf of a relative); 5 U.S.C. § 2309 (b)(9)(A)(i) (prohibiting retaliation because an employee exercises her rights under the law)).

court can take jurisdiction as well." *Id.* at 642.  Once the matter comes before the district court, it "cannot dismiss [the action] for failure to exhaust administrative remedies, [but there is] no reason why the district court cannot stay the case, or hold it in abeyance, for a reasonable period of time." *Id.* at 643.

The facts here present a slight deviation from in the standard scenario.  Dunbar actually filed her lawsuit prior to expiration of the 120-day window, but that window has since lapsed without a final decision from the MSPB.  Accordingly, in the absence of legal authority to the contrary, the court finds that Dunbar's Title VII termination claim is properly before this court.

At this juncture, however, the court is unable to make an informed decision about whether the matter should be stayed pending a final decision from the MSPB, and will therefore direct the parties to file short briefs on this issue, setting forth the precise nature of all claims currently before the MSPB, the status of the MSPB proceedings, as well as the advantages and disadvantages of staying this lawsuit pending resolution of those proceedings.

### ii.    Legitimate Non-Discriminatory Reason for the Termination

Finally, NHTSA argues that, even if Dunbar's termination claim is properly before this court, the agency is entitled to summary judgment because it had legitimate non-discriminatory reasons for terminating Dunbar.  "Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims.  First, a plaintiff must establish a prima facie case of retaliation; if she meets that burden, the employer must articulate a legitimate non-retaliatory reason for its action."  *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006) (citation omitted).  If the employer comes forward with a non-retaliatory reason for the challenged conduct

> the burden-shifting framework falls away, and the "central question" becomes whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008).   A key component of retaliation cases, in common with discrimination claims, is thus the battle over pretext.

*Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (some citations omitted).

The court is not persuaded that summary judgment is appropriate on Dunbar's termination claim because the sequence of events could lead a reasonable fact-finder to determine NHTSA acted with retaliatory motive when it terminated her.  Peoples contends she was dissatisfied with Dunbar's performance as early as 2010, but there is no documentary evidence of such discontent until the April 2012 transfer and relocation.  Two months later, Dunbar filed a second EEO charge, followed three months later by an "Achieved Results" performance review that, for the <u>first time</u>, included criticisms about Dunbar's performance.  It is unclear why Dunbar's performance reviews up until 2012 did not mention any performance issues, and it is also unclear why Dunbar received a bonus, as well as a "5 out of 5" recommendation for participation in an educational program in 2010, given Peoples' alleged concerns.

Finally, a reasonable fact-finder might determine that the reasons for the termination were pretextual, given the apparent absence of any negative performance issues between the time Dunbar filed her lawsuit and the date Peoples recommended her termination. While NHTSA submitted a declaration by Peoples explaining the reasons for the termination, the agency does not direct the court to any contemporaneous evidence.  (*See* Peoples Supp. Decl.).  Although such evidence is not required in order to grant summary judgment, the gravity of the alleged performance issues suggests that such evidence should have existed.  Instead, the record

indicates that Dunbar engaged in multiple instances of protected activity, and NHTSA appears to have had a spotty and inconsistent record of documenting Dunbar's alleged performance problems for as many as four years. Accordingly, based on the current record, summary judgment is not appropriate on Dunbar's retaliatory termination claim.

### iii. Whistleblower Protection Act

NHTSA argues that this court lacks jurisdiction to hear Dunbar's WPA claim. The WPA protects most federal employees from reprisals by agencies for "whistleblowing activity, such as disclosing illegal conduct, gross mismanagement, gross wasting of funds, or actions presenting substantial dangers to health and safety." *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002) (citing 5 U.S.C. § 2302(b)(8)). An employee asserting a WPA violation "must first bring her claim to the [Office of Special Counsel], which investigates the complaint. . . . . If the OSC finds no agency wrongdoing, then the employee herself may bring an action before the MSPB." *Stella*, 284 F.3d at 142 (citing 5 U.S.C. § 1214) (some citations omitted).

A claimant who wishes to challenge an unfavorable MSPB ruling may do so in federal district court, if she asserts a mixed WPA/Title VII claim. *Stella*, 284 F.3d at 143 (citing *see* 5 U.S.C. § 7703(b)(2), (c); *Barnes v. Small,* 840 F.2d 972, 979 (D.C. Cir. 1988)). Unlike some other "mixed-case" claims, however, if the MSPB has not rendered a decision within 120 days, the district court does not yet have jurisdiction over the WPA claim. *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 262 (D.D.C. 2013) (*comparing* 5 U.S.C. § 1221 (providing that "[a] final order or decision shall be rendered by the [MSPB on WPA claims] as soon as practicable"), *with* § 7702(a)(1) (requiring the MSPB to take action within 120 days of filing appeal against certain other prohibited personnel practices)).

Dunbar did not respond to NHTSA's argument that the court lacks jurisdiction over her WPA claim. Thus, it is unclear whether she has overcome any of her procedural hurdles. Although Dunbar asserts she complained to OIG about improper activity regarding her computer, it is unclear whether that complaint was sufficient, given the requirement that she file a complaint with the OSC. Finally, even if Dunbar did comply with the necessary procedural hurdles, she has not apprised the court as to whether there was any final decision by the MSPB on her WPA claim. Accordingly, this court lacks jurisdiction to hear Dunbar's WPA claim.

## IV.   CONCLUSION

For the reasons set forth above, the court will grant NHTSA's motion for summary judgment on Dunbar's WPA claim and all pre-termination retaliation claims, except for those associated with her: (1) August 2011 "Achieved Results/Meets Expectations" performance evaluation; (2) August 2011 "dilution" of duties; and (3) April 2012 transfer of duties and relocation away from other HR personnel. Additionally, court will dismiss Dunbar's Section 1981 claim and, to the extent Dunbar asserts a Title VII disparate treatment claim, the court will dismiss that claim.[16]

---

[16]  The court notes that, for the most part, Dunbar does not cite to the record in support of her factual assertions and, when she does, the attached exhibits appear to have no correlation to her asserted facts. Dunbar is hereby reminded that the court has no obligation to parse through the record when evaluating a dispositive motion. *See* Fed. R. Civ. P. 56(c)(1)(a) (requiring that parties "cit[e] to particular parts of materials in the record" in motions for summary judgment or oppositions thereto); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) ("[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and other interrogatories in order to make its own analysis and determination of what may, or may not be a genuine issue of material fact.") (citation and internal quotations omitted).

Additionally, Dunbar's response to NHTSA's statement of undisputed facts ("SOF") is woefully inadequate. (Pls. Response at ECF pp. 3-4). While NHTSA's SOF contained twenty-four paragraphs, Dunbar's "responses" contained only four numbered paragraphs, along with three unnumbered paragraphs. It is therefore impossible for the court to determine which

Date:  March 31, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

"responses" corresponded to which numbered SOF.  Additionally, her "responses" were not "concise statement[s] of genuine issues setting forth all material facts," as required by Local Civil Rule 7(h), and contained numerous arguments, rather than facts.

Similarly Dunbar's own statement of facts generally lacked citations to the record and contained arguments—rather than facts.  (*See* Pls. Response at ECF pp. 5-12).

Dunbar is hereby warned that her failure to direct the court to the exhibits supporting her factual allegations, as well as the specific information upon which she relies within those exhibits, may result in the court making a determination that she has failed to provide evidentiary support for those allegations.  *See Jackson,* 101 F.3d 145 (upholding District Court's order striking plaintiff's statement of facts where, among other things, the plaintiff's statement did not contain citations to the record and Plaintiff failed to dispute movant's statement of undisputed facts).  Finally, Dunbar is also warned that her failure to properly respond to each allegation in NHTSA's SOF, or her failure to respond with citations to the record, may result in the court treating those allegations as conceded.  *See id.*; Statement of Facts Response Example on the court's webpage at: http://www.dcd.uscourts.gov/judge-tanya-s-chutkans-court-webpage.

Going forward, to the extent Dunbar wishes to rely on documents that she submitted and the court accepted for filing on the docket, she may do so by citing to the ECF Document number, along with the appropriate ECF page number(s).  Such a solution resolves any potential cost issues associated with resubmitting her current exhibits.

32